We will now hear argument in the case of United States Chamber of Commerce v. City of Seattle. I note for the record that the parties have moved, particularly the U.S. Chamber, to have that one go first instead of the Clark case, and we are granting that motion. I want to make one other note for the record. The Court is, of course, aware that the spouse of one of our colleagues is on this brief and, indeed, at the table. This is not wholly unusual in the Ninth Circuit, but we, of course, will decide the case in accordance with the law and not with respect to any relationship. We also assume that our colleague will follow any appropriate rules of recusal when and if en banc activity occurs. So I guess we're going to hear first from the Chamber. Good morning, Your Honors. Michael Carvin for the appellants. I've given five minutes of my time to the FTC as amicus, and I'd like to reserve three minutes for rebuttal if that's okay. Okay. So basically you're looking at 12 minutes before he takes over, right, or he or she? I'm not sure she's taking over. She and I will have three for rebuttal if that works. I'd like to obviously to show that they are entitled to State action exemption. Seattle needs to show that the State affirmatively decided that collective bargaining or price fixing by drivers relative to ride referral services was authorized conduct. But the reality is the State had nothing to do with this. It was Seattle's exercise of its discretion, and Seattle was overseeing it. I think the easiest way to express this is it's binding precedent in the Ninth Circuit, and I quote, that Seattle needs to prove not only that there was a policy to displace competition, but also that the legislature contemplated the kind of action being challenged. Neither the district court nor Seattle even alleges that the legislature contemplated collective bargaining or price fixing. They argue that it was unforeseeable, and they are filling in the gaps pursuant to delegated discretion. Counsel, let me ask you this. We have three statutes that we're talking about here rather than individually citing them. I'll just call them the statutes. Let's assume for a moment that those statutes were being enacted contemporaneously. In other words, at a time after which Uber and Lyft, for example, had been in business for some time. What would the legislature have to do to change the language of those statutes, all or any of them, in order to meet the requirements of the Supreme Court in this particular setting? Well, the simplest solution would be they'd authorize Seattle to regulate compensation of drivers and ride referral services or compensation by ride referral services and drivers. But what did they enact? They enacted under the immunity provision, which they hang their entire case on, they said, municipalities can regulate for hire transportation services without liability. For hire transportation services, the service of transporting people. It didn't say for hire transportation operators, although that's a defined term under the statute. It didn't say the for hire transportation service industry. It didn't say things that affect for hire transportation services. So they argue vigorously that Uber and Lyft come under the statute. I'm prepared to concede that for argument's sake. Fine. That means you can regulate Uber and Lyft just like you can regulate the drivers with respect to transportation services, the things articulated in the statute, safe, reliable vehicles, reasonable rates. But what you can't do is regulate the compensation that the drivers charge the ride referral services or that they provide to the drivers. So your view is that because the statutes speak of for hire, which contemplates people actually operating the vehicles, that that's the focus, and as long as that's what Uber and Lyft are doing, that the statute would cover that. But otherwise, no difference? They can regulate either the drivers and the Ubers, I'm prepared to concede, with respect to the service of transportation. It's a consumer protection statute. It's protecting passengers against unsafe, unreliable, or excessive rates. But what they can't do is take that consumer protection statute and start regulating the labor relations between the drivers and Uber or antitrust contracts between Uber and independent contractors. Under the catch-all phrase, they say they can do things that ensure safe and reliable service, and they in the district court said that gave Seattle discretion to regulate that. Again, I'm prepared to concede that for argument's sake. What that means is Seattle exercised its discretion under the statute to impose this collective bargaining regime. But that just means that doesn't mean that the state mandated that or authorized that. That means the state didn't foresee it, and they filled in the gap. That's where I get back to my original question, which I don't think you answered. What I wanted to find out was if you take the three statutes, in what way would they need to be changed in order to meet the requirements of the Supreme Court to regulate this area, to do away with competition, recognizing that Uber and Lyft and the type of services they provide exist? Right. If I wasn't clear, they needed to make some reference to the relationship between the drivers and Uber and Lyft. In other words, they needed to talk about, as we see all the time in statutes, that it's not just the provision of transportation services. It's the compensation or the employment relation or the contractual relationship of the people providing it. If you had a statute that says you can regulate emergency room services, we would know that that means you can regulate how doctors serve patients that come into the emergency room. We would also know that they can't regulate collective bargaining by the nurses versus the doctors or the doctor's contract with the hospitals or the doctor's contract with insurance companies, even though all of those directly affect these kinds of services. And that's the key point that I think the district court fundamentally erred on. He thought that if it was within the discretion, delegated discretion, then it was okay. But every Supreme Court pronouncement has said no. It's not, to use the Federal analogy, a Chevron prong two question of whether it was in delegated discretion. It's a Chevron prong one question. Did the legislature itself speak to the precise question at issue? Phoebe Putney said it had to be foreseen. North Carolina said it had to be foreseen by the legislature. They're not arguing that. Three cases, Tycord, North Carolina, Phoebe Putney said this is a disfavored thing, and therefore it's like implied repeals of legislation. Well, we all know you can't implicitly repeal legislation. And what the Supreme Court was saying is you can't implicitly give them authority. As Phoebe Putney put it, if there's ambiguity or any doubt about whether the State statute spoke directly to this, then State action exemption is not entitled. Well, is it possible that Lyft and Uber drivers occupy more than one market? Well, I think it's ‑‑ I don't ‑‑ I think they're all in the same market. They're providing transportation services. Again, the question we're talking about here is whether or not they're regulated in this particular field. And I'll go back to my prior kind of common sense analogy in addition to these cases, which is you need to say what this was regulating was the relationship, the consumer protection relationship between drivers and passengers. And, yes, obviously Uber drivers have other relationships, namely with Uber, and that was not in any way touched upon by this statute. And that, I think, goes to the Ninth Circuit's decision in cost, where they overruled the district court who said that the anti‑competitive conduct was authorized because the State agency had empowered, been empowered to do this anti‑competitive thing. And this court said, no, the State statute itself must have specifically authorized the conduct alleged to violate the action. Can I just change the focus just for a second here? Unlike some of the early post‑Parker decisions, you don't have a situation here where it's the City of Seattle itself that is the unilateral mover here. You've got two private parties who are fixing prices, among other things. They're just fixing prices that normally would be barred by Section 1 of the Sherman Act. Right. So in this case, the city takes the position that what its director does is enough to wash that in the blood of the lamb, so to speak, because he or she has a part in that. What's your response to that? No, I mean, the Supreme Court couldn't have been clearer on that. I believe they invoked Fisher for that. If you authorize two private entities to engage in a price fixing agreement, if they said you can price fix rates that you charge for selling widgets, that's obviously authorizing a per se violation of the Antitrust Act. And no supervision of that agreement to establish a private cartel can save it. What they were talking about in Fisher was, look, they weren't authorizing the landlords in the California city to price fix and jack up the rent. It was the city itself telling them to do this. Well, they're not going to get up here and tell you that Seattle is dictating the terms of this collective bargaining agreement between the drivers and Uber and Lyft and Eastside. What they're going to tell you is that they authorized it, and then at some level they'll review it. But those are two entirely different – Under the terms of the statute, let's assume for a moment that in this case, I think now it's established that the Teamsters and the drivers are unable to reach an agreement. They then go to, I think, the director. The director can establish arbitration. Right. So if the arbiter comes back with a fixed price, does that help from an antitrust perspective in any way? Not at all, because what you need is, as Fisher makes abundantly clear, you need to show that there was no room for the private actors to do anything. In that case, it was a dictate from the city council to them, don't raise your rents. Now, if they had colluded and raised everybody's rents in the city and then went to some city person and said, is this too much, that wouldn't change the fact that you've had two private people getting together to form a price-fixing agreement, which is at the heart of the per se violation of the antitrust clause. So, no, that's not a get-out-of-jail-free card. I think their argument is that, well, they authorized anti-competitive conduct in some aspect of this industry, and therefore we can assume they were authorizing anti-competitive conduct in all aspects of this industry. But obviously the state couldn't have authorized anti-competitive conduct for things it had not affirmatively contemplated. It was only authorizing anti-competitive conduct for the things that it had affirmatively contemplated. It's more or less a non-sequitur to say that, well, we didn't think about it, but if the city wants to do it, fine. What's your best argument that the statutes, the three statutes, had to affirmatively contemplate the very contractual relationship, if you will, the gig economy that exists in connection with Lyft and Uber? In addition to the four cases I've already cited to you, I'd like to cite Ninth Circuit and Supreme Court cases which make it clear that authorizing X as anti-competitive doesn't mean the things that are related to X are authorized. Phoebe Putney, they authorized anti-competitive conduct with respect to entry of hospitals into the field, but not acquisition of hospitals. This Court's decision in Medicare authorized anti-competitive conduct in dispatching air ambulances, but not in operating air ambulances. Very close connection. Is the fact that these types of arrangements are discouraged, if you will, they're narrowly construed, does that play into our analysis? Absolutely, Your Honor. We are talking about the federal judiciary carving out an exemption to the plain language of a federal statute, which the Supreme Court has often referred to as perhaps the most important statute in the United States Code. And as a consequence of that, we've created a very narrow exception for states, states which have sovereignty. We will not allow the states to delegate this responsibility and have 40,000 municipalities across the country being able to carve at random exemptions to what we view as the most serious kind of, we being the United States Congress, views most serious anti-competitive conduct. You spend most of the time on the antitrust, the immunity, the parker immunity. Is it the labor preemption, sort of a threshold issue here, that is if the labor preemption bars the state from requiring this kind of arrangement, doesn't that dispose of the case? We would think the antitrust issue is more threshold because you need not wander into it. But labor is a preemption. The antitrust is a defense. It's an immunity defense, isn't it not? No. To be clear, it's quite clear under Fisher and other cases, if the city authorizes per se violations of the Antitrust Act, just the authorization preempts the state statute. You don't want cities going around authorizing violations of federal statute. There is certainly also a labor preemption argument, Garmin being most obvious, and there the only question is whether or not if these people are arguably employees under the National Labor Relations Act and everyone agrees that states and municipalities can't start undermining the NLRB's exclusive jurisdiction by making rulings on that. And there's really no question that these people are arguably employees. Indeed, I don't think they'll come up and contest that today because it's undisputed that they're at least arguably employees. And the reason for that is obviously because it's in front of the NLRB now. Three district courts in California have already ruled that they're employees, and the Teamsters are arguing it. And the district court simply blew by all of that by saying, well, you, Chamber, Uber, Lyft, didn't affirmatively argue that they are employees. But it's not a catch-22 gotcha situation where we have to sacrifice our views in front of the NLRB to say the reality, which is this is in front of the NLRB. All we have to acknowledge is that this is the kind of thing the NLRB is about to decide. So if they were independent contractors, what would happen instead of employees? Then they're independent contractors that violate the antitrust law. If they're employees, it violates the NLRA. And it was just at that margin of error that Garmin is talking about. That's why it didn't say you have to decide whether they're employees. You have to decide whether they're arguably employees. Is it the kind of thing that's going to come in front of the NLRB? It's already in front of the NLRB. And what we don't want to do is pretermit the NLRB's exclusive jurisdiction over these delicate questions where we need national uniformity throughout the nation. Okay. Your colleague over there, I think, is anxious to come up and speak. So let's hear from her. Good morning. Good morning. I'm going to adjust this. Oh, wrong way. No. Wait a minute. We can tell you're with Lyft and not Uber. There we go. Neither. You can tell. I'm with the federal government. There you go. All right. Good morning, Your Honors. Michelle Arrington with the Federal Trade Commission. I want to underscore three things that the Supreme Court has said that are not enough to show that the state has clearly articulated and affirmatively expressed an intent to displace competition in the activity that's being complained of. And I'll list those, but I would like to first address the question that you asked, which is what the state would have to do in order to affirmatively contemplate. And your question presupposed that there would need to be in the statute an affirmative expression relating to the gig economy. But actually the deficiency or what's missing from the statute is not limited to the kind of tech being used by the gig economy and Uber. The problem is that the statutory scheme as it's set up does not address whether it's for tech companies like Uber and Lyft or for traditional for hire companies that do not employ their own drivers but use independent contractors. What is missing in this statute is any indication that the state affirmatively contemplated the compensation that's set between the for hire drivers who are independent contractors and the company that provides coordination. Your issue that the state statute in delegating this authority to the city, it could not do that. But the state itself could do it. The state could do it and the state would have to in order to exempt the municipal regulation that's at issue here would have to have something in the statute that indicates and that's what's missing here. The clear and articulate issue. It would need to clearly articulate an intent for the municipal regulation to extend or to reach the decision of that compensation between the drivers and the for hire transportation companies. So the court would not be determining whether or not the arrangement violated the antitrust laws necessarily but that the state's delegation of this authority to the city was improper. The inquiry for purposes of the state action antitrust exemption is whether the particular activity that's being addressed and complained of here, whether the state in giving a general grant of regulatory authority and in particular in granting the authority to regulate transportation services, which is what the passenger, the consumer gets, whether it affirmatively contemplated the compensation that drivers reach in their agreement with the companies. So let me be sure I understand the FTC's position. You're saying that in order for these three statutes to effectively provide immunity in this case, they would have had to indicate that the cities had the right to fix prices basically, set the compensation with the drivers and that failing that, the laws do not provide an adequate platform to delegate what is otherwise a state-owned privilege. Is that right? It would not authorize anti-competitive regulation. Whether broadly it authorizes regulation, it may be that they can regulate under the statute, but you need to have the authority to displace competition. Are there cases, though, where the Supreme Court or courts of appeal have blessed state statutes that have delegated to cities or counties the right to, if you will, act in an anti-competitive way that aren't as specific as you've talked about? Well, I mean, the zoning regulations, for example. Sure. Zoning regulations, that's a very general authorization to erect. And so it doesn't have to be particularly, the delegation doesn't have to be particularly specific into the ways they can do it, but that's the inherent, that's of course the ability question. They clearly have to indicate that the fixing of compensation is within the charter that the state is giving to the city. Is that right? It would have to be specific enough so that you can, again, it's a very strict standard, and that's the problem with what the district court did, is it applied a very loose, clear articulation standard that the Supreme Court has repeatedly. Is it because in antitrust terms it didn't regulate the market? Is that what the issue is, whether or not it regulates the market? Not so much in the detail that it would have to be compensation, but in the antitrust terms this is a market that was not intended to be regulated. That is definitely one way of looking at it. You can also just say kind of the realm of activity within a broader industry. And I just want to make one particular point, and this is what the federal antitrust agencies are particularly concerned about, is that in pointing to the general authorization to regulate for purposes of safety, and in pinning the clear articulation and finding clear articulation relating to that, that is our particular concern because there is so much delegation of municipal authority to regulate or sub-state entity authority to regulate that have not just public safety, but public welfare types of authorizations as a catch-all. And if you're going, if this court affirms on that particular ground, that creates a giant loophole in the state action doctrine, where any time the sub-state entity could pin its anti-competitive regulation or action to a general public welfare goal, that would drive a truck through the state action doctrine. And that is precisely the opposite of what the Supreme Court has said is required in the inquiry. So can you give me an example of what the language would say to fulfill what you are requiring? I believe that one way is just to, you know, the enumerated in addition to authorizing the regulation of rates, it could authorize the driver's compensation, that to regulate driver's compensation doesn't have to specifically identify through what means you would regulate compensation, but that's an example of where the state would be clearly articulating and showing that it has affirmatively contemplated driver's compensation as distinct from the rates that passengers are charged. Other questions by my colleagues? All right, thank you very much for your argument. We'll now hear from the city. Good morning. Good morning. Thank you, Your Honor. May it please the Court. Michael Ryan, Assistant City Attorney. I'll be addressing the antitrust issues for about 12 minutes, and my colleague Ms. Layton from Alchula-Burzon will be addressing the labor law issues for the remaining eight minutes. I want to get to a point that was discussed a lot during the first part of the argument, and it related to the market and what the market is. And I think that that's an important question here, because both the FTC and the Chamber look at this case and say, well, there are two distinct markets. Well, first off, the statutes at issue aren't regulating a market in the antitrust sense of the word. The statutes at issue are attempting to provide individuals who get into a car and go from point A to point B with a safe and reliable ride. And the bottom line is, while the technology may have changed, the fact of the matter is the focus of the regulation in this case has not for higher compensation rights. With respect, though, you're regulating a whole different level. The statute before regulating basically the taxi cabs and transportation, people like to lay limos and so on. Here you're talking about a ride-sharing service. These people don't own the cars. They don't provide the cars. They don't do anything other than make that coordination. Your opponent has suggested there is a foreseeability requirement. I'll be interested in your comments on that. But if you had a situation – well, let me go back. Do you agree that prior to the time that Seattle enacted this ordinance, there was no other such ordinance focused on the Uber-Lyft issue in the United States? Well, I guess I'm trying to understand the base of your question in terms of an ordinance like this, in terms of – In other words, was Seattle the first city to enact an ordinance that was specifically trying to regulate the prices charged through Uber and Lyft? Well, no, not the prices charged through Uber and Lyft because that can be done by general rate setting. Now, it may be that they tried to – That's what this regulation is all about, though, fixing the work condition and compensation of Uber and Lyft. I know there are other people besides Uber and Lyft involved, but just for shorthand, I'm going to say Uber and Lyft. Isn't that what this ordinance is all about? Well, at the end of the day, what this ordinance is all about is ensuring that the citizens of Seattle get safe and reliable transportation. Council is a court. You don't have to shield it. Let's talk about what we're talking about here, which is the compensation. That's the elephant in the room. It's not the safety. It's the elephant in the room. So let's talk about that. Is the Seattle ordinance the first ordinance by a municipality in the United States to attempt to regulate the rates that are charged by Uber and Lyft? I guess I'm struggling with the word rates. If you're saying the amount of compensation between the driver and Lyft, the answer is yes. Okay. Absolutely. So this is the first. There was no other one. Okay. Do you also agree that when the three statutes were passed that nobody, maybe I shouldn't say nobody, some visionary perhaps, but Uber and Lyft didn't exist, the technology didn't exist. They couldn't possibly have been considering that. No, I don't agree with that, and I'll tell you why. Because the statutes at issue aren't focused on the technology. It doesn't matter whether or not you hail a cab by hand or you call up a dispatch or you press a button on your phone and a car comes. What the legislature was focused on was ensuring safe and reliable transportation for individuals who hire for higher transportation services. So, right, the technology may have changed. Well, then why are you regulating then Uber and Lyft as opposed to the drivers who are performing the service that you say needs to be safe and reliable? Because the city made extensive findings that the business models of these companies and the unreliability it places on these drivers and the fact that they can be kicked off an app without knowing why and that they have no ability to discuss their terms and all of those things. But, counsel, with respect, you were talking before about the public welfare, about safety. This has nothing to do with that. You're talking about the compensation of the drivers, right? Because the compensation of the drivers as the amicus brief of 12 states as well as the District of Columbia have made very clear that the compensation of the drivers does have an impact on safety and reliability, and those are the type of legislative findings that the city of Seattle was allowed to make and the court shouldn't be looking behind. Tell us why it has a role in the safety of the passengers. Because if a driver is well compensated or a driver understands that they're going to be able to not get kicked off the app, they're going to stay in that position and they're going to become better drivers. But they have a choice. They have a choice. They don't have to work for Uber or Lyft. They can decide they're not going to do it. They can decide not to accept a particular ride if they don't want to. They can decide to go to a bar, have a drink. They can go to a nice restaurant, have a dinner. They don't have to put that money into their car or their bus, right? Nobody has to work for Uber and Lyft, but people do have to work and people do have to earn a living and people do have to make money, and we have a situation where we have drivers who are driving maybe 18 hours a day. Would you concede that this arrangement is a per se violation of Section 1 of the antitrust laws? No, we do not concede that. For purposes of this appeal, we have not contested it because if you look at the antitrust law professor's brief on our side, they explain how basically the Chamber's theory of per se violations kind of collapses on itself because Uber claims to be selling a service to these drivers, not that these drivers are selling a service to Uber. Well, let's look at, at least as I understand it, the reality. This ordinance permits two private parties, the Uber-Lyft people and, in this case, the union. It doesn't matter whoever the person is or entity is, and they get together and they decide what's going to be charged and how much the drivers are going to make. That's price fixing, right? Well, yes and no, and it's not because, one, it doesn't deal with the rates that the consumer pays. No, but let's just focus on this. Between them, how much is going to be charged and how much the driver is going to get, that's price fixing, unless there's an exemption, but it's price fixing, right? I don't believe that that necessarily is price fixing because this is a brand-new arrangement that is out there, and the Supreme Court's made clear we can't just slap per se, but the point is— It's a brand-new arrangement, but yet foreseeable. Is that what you're arguing? Because, I mean, what you just said right now in terms of the brand-new arrangement seems to be inconsistent with your position because this ordinance was passed in the 80s and the 90s, and I'm just trying to figure out, unless you dispute foreseeability is an important factor for us to consider. I think there are two points there. If we're trying to determine whether something's a per se violation of the antitrust laws, then we're looking at pure antitrust law. We're looking at pure markets and things of that nature. But when we're talking about Parker immunity, and I want to make this point very clear, the notion that the Chamber has said and the FTC has said about slicing up these markets, that notion was expressly rejected by the Supreme Court in the Omni case because Justice Stevens in the dissent in that case said, no, no, you have to focus on this— The dissent? No, no, Justice Stevens in the dissent said you have to focus on the specific industry, and then Justice Scalia—  I'm just saying in response to the dissent, the majority said, under the dissent's second requirement for a valid delegation of Parker immunity, the authorization to regulate pertained to a specific industry. And then they go on to explain that that doesn't make any sense in the context of the regulations that they were looking at in South Carolina, because you don't slice up the industry to zoning with respect to billboards. Zoning is a unique situation, though. What I'm struggling with is this. You seem to be reluctant to concede the fact that when you have two private parties who set the prices, that's price fixing. Now, you do have the state immunity. If you're entitled to that, then it exculpates you. I get that. But that's what we're talking about. There is an agreement between private parties that sets rates. It sets rates. And then the city gets to bless them or not bless them, as the case may be, but it's the private parties that are doing it. And as I understand the case law, this makes it a hybrid. And in a hybrid situation, it's strictly construed, right? For purposes of this appeal, we're not challenging that this is a per se. I'm just saying that if it goes back to the district court because we don't have immunity, we'll make all those arguments. We get that. But the reality is you agree that, you know, for purposes of this discussion, it's a per se violation. We also have the fact that you've got a hybrid situation. You also have the Supreme Court indicating that these types of state action immunity, they're basically frowned upon, increasingly so. And you look at the case law and it backs that up. So what I'm struggling with here is you've got the issue of foreseeability, and I think anybody would agree, 2015, you're the first ordinance in the country that specifically focuses on this. Probably not foreseeable. It's narrowly construed by the Supreme Court. You've got arguably a different market, different people involved, and you've got private parties setting the rates. I'm struggling with that. Why is that okay? Well, if I can address each of those points. Okay, go ahead, please. Because, first, with respect to the market, there's no different markets because we're not looking at this in an antitrust style market. Yes, we are. We are looking at it. Please hear me. We are looking at this as an antitrust market. That's what this case, at least part of this case, is about. And that's what we hope you will help us address. And I'm trying to. Okay. And I apologize. But the focus of the clear articulation prong is on the displacement of competition, not the specific conducts at issue. The Supreme Court has made clear time and again that you don't need a detailed legislative authorization for everything you want to do pursuant to a statute. Again, that avoids the issue of a matter of federal law, which is a matter of what is the market that is being regulated. I think you're addressing it from the point of view of state law of what type of delegation the legislature may make to the city. But if that delegation conflicts with federal antitrust law, then it can't pass muster. Again, I go back to Omni because there the court was saying, look, we're not going to look at this as different. For example, you have the ability to zone and it's not just billboards. That would be its own market. It's not TV antennas. It's not mobile homes. And the Supreme Court said to describe that as cutting it up in that way is to refute it. That was Justice Scalia's words. And the reason he said that was because he said not only do the precedents don't suggest that approach, but they positively reject it because municipalities needn't be able to point to a specific, detailed legislative authorization in order to assert in a successful Parker defense. In 2015, the legislature visited this issue in terms of regulation. And I believe the House or the Senate report addressed that they had never regulated in this area. What do you make of that? Well, one, I don't think that that's an accurate reflection of what that document says, because the document that they're pointing to is a staff report that very clearly says this is not part of the legislative history. So that document is not worth the paper it's written on in terms of legislative history. But when you do look at what the legislature actually did, all they did was touch their insurance requirements. But wouldn't it have had an opportunity to expand or address this particular issue in 2015 so we don't have to go back to 1980s or 1990s? They could have. And, in fact, Uber and Lyft are the ones that promoted that bill, and they asked to have themselves excised from the for hire transportation statute, and the legislature didn't do it. So that's at least an indication that the legislature in 2015 believed that they were under this statute. In fact, Uber and Lyft have operated in this city for years under the auspices of that authority. They provide us data that they don't necessarily want to provide us under that authority. They get licenses. They do all of these things. They've been acting as if they're under this scheme. But there's no question that you have the ability, just under general regulatory law, to get the data you're talking about. What we're talking about here is price fixing. It's a federal statute. And you're claiming to be eligible to an exemption that protects you. The exemption is supposed to be under parking to the state. You believe, and case law seems to back you up, that that can be delegated to the city. Your opposition indicates, and certainly the FTC does as well, that this has got to be foreseeable. It's got to be specific about the rate fixing. That's what I'm struggling with here. You can regulate them in terms of getting, you know, the drivers have to get lube jobs. They have to get their car washed. They have to stop and help people. That's all cool. But that has nothing to do with fixing rates. That's what I'm struggling with. And I really am not seeing, particularly since the Supreme Court has narrowed this exception, and you've got a hybrid situation where private parties are fixing the rate. Help me. How do we get past this? With respect to the narrowing, and I think you were referring to the it's disfavored. None of the Thai court cases. Yes. It's disfavored much in the way as repeals by implication are. And in all of those cases, what the court is searching for is not whether the specific action or conduct is appropriate under state law. They're trying to determine whether or not the legislature intended to displace competition with regulation in the regulated field. And in this particular case, we're talking about antitrust. We're talking about prices, price fixing. And so then we get back to the issue, where in this legislation do you find anything that says that you can fix prices? We have the authority to ensure safe and reliable transportation. But counsel, with respect, that argument just doesn't fly. I mean, you know, yeah, you need the drivers to do certain things. You already have the ability just on your city ordinances to require drivers in the city to take good care of their cars and all that sort of thing. But we're talking about fixing prices. Where is the authority in any of those three statutes that gives the city the ability to force these parties to fix prices or let them fix prices? We don't have a specific authority. We don't have the words that you can fix prices between the drivers for Lyft and Lyft. What we do have is rate-setting authority and a way to set rates, which is what the consumer ultimately pays. So there is a price-fixing aspect to that ordinance. But this isn't a rate-setting that you're talking about here. You're not posturing it in that way, are you? No, we're not. Okay. But I think if you were asking for indications in the statutory text, and I want to get back to the point about being disfavored. It's disfavored because they don't want to infer an anti-competitive intent on behalf of a state legislature when they don't want that to occur. Now, here we have a statute that's pretty express that it wants to displace competition with regulation in the regulated field, and that's the four higher transportation services and taxicab services field. So we have that first part of the analysis. So what we're really arguing about is what's the scope, if you will, of state law. Let me ask you this, counsel. There's been a Hotelier Act in Washington probably forever. Does the city of Seattle have the ability, without more, to enact an ordinance somewhat similar to this that will regulate Airbnb? No new statute, just Airbnb, and you can have all the homeowners that want to participate in Airbnb meet together with whoever is selected as a representative and fix prices. Do you have authority to do that? Well, I know we regulate Airbnb right now, and if we were doing that pursuant to a specific – Prices?  But what I'm trying to say is that if we had an express delegated authority from the state to regulate a particular field like we do here, that these companies and these drivers, they all clearly fit into, then we'd have to analyze that statute. Now, if we were trying to go under a general home rule power or general police power, then we would be much more like the city of Boulder who tried to regulate cable rates or Phoebe Putney who tried to use its basic powers to acquire property to do something anti-competitively. Again, in Phoebe Putney, there was no indication in the statute itself that the legislature intended any of the powers that the state delegated to this group would be used anti-competitively. Here we have that. So I understand you're saying that the for hire services provision is specific enough, especially in light of safety and reliability. Yeah, we're saying it's specific enough because it's a broad delegation to us at a targeted field. And the Supreme Court has said you don't need a specific detailed authorization for every possible act you're going to do because that puts an unrealistic view of how legislatures do their job. They can't be expected to catalog everything. And your best case for that is Putney? Is that what you said? No, I think Phoebe Putney is helpful because Phoebe Putney says if the displacement of competition is the ordinary or reasonable, you know, event of what's going to occur. But I think our best cases that I would focus on are the Southern Motor Carriers case, which goes through in detail why you don't need a specific legislative authorization to do something. The City of Omni case, which talks about the difference in the markets, particularly in footnote four. And it also talks about under state law, when you're challenging state law or the scope of state law, you have to look at Parker. Parker takes a broad view of state law authority. I mean, this court in Treweek and Llewellyn and all those cases make clear that even if you're not doing something right under state law, it doesn't mean you lose your Parker defense. And I think at the end of the day, Town of Hallie is an important case because, one, it says we presume that municipalities are going to act in the public interest. And that's what we've done here. What about footnote 10 in Hallie? That goes to the state supervision requirement. And in Hallie, ultimately, when the municipality is the actor, you don't need to do that. You don't need to have active supervision. But it didn't have occasion to address the question specifically about whether or not you need to have active state supervision when the municipality is the one doing the regulating. And we know that this court in Tom Hudson said the municipal supervision was okay. The First Circuit has said it. The Eighth Circuit has said it. The Second Circuit in the Electrical Inspectors case has said it. The leading antitrust, Arita and Hobenkamp, says it. And then Practitioner Garland, now Judge Garland, in his law review article. And it makes perfect sense. I must say I found that reference hilarious. I thought it was great, though. Anyway, any of my colleagues have additional questions before you have your co-counsel? I'm happy to answer more questions. Okay. Thank you. We'll give you a couple of minutes. I know you're deprived. I appreciate that, Your Honor. I just wanted to briefly address an antitrust point and then address Mr. Carvin's arguments on NLRA preemption. In terms of the issue that was the subject of an exchange recently, the City Council made specific findings that collective organization of drivers would further the purposes of safety and reliability. That is in keeping with the federal law, as the New York amicus brief points out, the determination that the collective organization and bargaining of employees furthers stability in industries. I mean, what about independent contractors? Excuse me? What about independent contractors? You're assuming they're employees. No, Your Honor. I'm not assuming that they're employees. What I'm explaining is that the federal government determined through the National Labor Relations Act that collective bargaining of employees in that instance furthered the interests of safety and reliability in an industry. Here, the City of Seattle has made a similar determination with respect to drivers who are independent contractors. Only independent contractors are covered by this ordinance. Counsel, let me just ask you this, though, because at least from my perspective, we're trying to divide the baby here in a funny way. At least from my perspective, I have no argument at all with the safety issue, no argument at all with anything like that. I'm talking about the competition with regard to compensation. That's it. That's the lodestar. What does safety and the general welfare have to do with price fixing? How is that exculpated? I'd like to make two points in response to that, Your Honor. One is I would encourage, Your Honor, to look at the City Council's findings. The City Council actually looked at the history of collective bargaining in other transportation industries. Those were industries that involved employees rather than independent contractors and found that when those workers had collectively organized, it had improved the safety of those industries. The second point I would like to make. I'll stipulate to that. But let's talk about compensation and price fixing. Tell me about that. The City Council also made specific findings that related to drivers who are working long hours, who are sleeping in their cars because they have to live outside the city of Seattle because they can't afford to live in this area, that are neglecting safety because they don't have adequate compensation. The compensation of these drivers is low enough that it is very much threatening the safety and reliability. But I would like to point out also that the City of Omni decision makes clear that it is not the role of federal courts to look behind the justification that a local entity gives. In that case, it was very clear that the city entity there had been acting to favor an incumbent billboard provider. That would seem to undermine your argument involving safety. That is, if this is a price-fixing arrangement, the reason why you enter into the price-fixing arrangement would be irrelevant. Your Honor, I'm not sure I'm understanding. You're justifying it on the basis of safety and improvement in the quality of service, et cetera. But if it is a price-fixing arrangement, do we look behind it and find out why you're entering into the agreement? It would seem to me that would cut against your argument. Your Honor, the City of Omni decision by the Supreme Court didn't say – what the City of Omni decision said is that one assumes that the city entity is acting pursuant to the delegated authority that the state has given it. In that case, it was for the public welfare. But in actuality, the City Council may have been conspiring with an incumbent billboard operator, but it didn't matter because that's not the role of the federal courts to deconstruct what a local or state legislative body does. And I would also like to point out that prices are being set by private parties in the market right now. They're being set by two very dominant market actors, by Uber and Lyft, in the far higher part of the transportation industry. Here, what this ordinance is doing is giving drivers a role of discussing those prices, as well as other factors that are also the subject of negotiations under the ordinance, including safety standards, hours. And nothing takes effect without the director's approval. That fulfills the act of supervision. But, counsel, I just – I'm really struggling with this idea that because the cost of living is high – and everybody knows, particularly here with the huge Amazon expansion and so on, and in San Francisco, for example, it's really, really expensive to live in these cities. No question about it. But it's not just the function of cabs and transportation. It's just a general problem. So I gather that your position is that under a general welfare, the general benefit of the workers concept, that it's okay for the two private parties, in this case the union and Uber, to fix prices. Let's say they'll double the prices. That's okay because ultimately that will help the drivers live better and therefore they'll be safer. Is that your argument? Your Honor, my argument is that the City of Seattle will look at whatever agreement is reached between the drivers and the companies and determine whether the terms of that agreement further the purposes of safety and reliability. If doubling the rates doesn't, then the city can disapprove it. I understand. So how does the director determine that it's going to improve safety? What matrix would the director use? Let's say they double the rates and it comes to the director and the director looks at it and says, okay, they've doubled the rates. How does the director know that's going to improve the safety? Your Honor, as it exists now, Uber and Lyft can unilaterally double rates. I understand that, but that's a private situation. You can even sue them for antitrust violations if they do that. Here we're talking about a hybrid situation where you've got two private parties who under municipal authorization fix prices, they then come to the city to get a blessing, and the question is whether the state immunity doctrine applies. What I'm having trouble with is this idea that somehow if you double the rates that it will improve the safety. Is there anything in the record that shows statistically that that's true? Your Honor, what the record shows is that the city council determined that allowing drivers to have a voice in issues like their compensation, safety standards, hours of work, activation and deactivation, that that would further the purposes of safety. That's an argument for a union, and I get that, and that's perfectly legitimate. I get that. But here we're talking about a required situation where unions may or may not be involved, and the private parties fix the rates, the city blesses them, but the ultimate goal is, you say, basically just the public welfare. It's going to make them safer. And, Your Honor, the ordinance and the implementing rules give the director the authority and actually require the director to undertake the inquiry that is needed to take evidence from both sides, to hold hearings, to ask for additional documentation to make that determination. Assuming he or she doesn't agree with what's proposed to him. Assuming that he or she doesn't. Assuming that he or she doesn't agree with what's proposed to him by the two parties to fix the prices. Then the director disapproves it, and it does not take effect. Right. It is not permitted to take effect. I guess I wasn't really sure. But the interest arbitration that is provided for in the ordinance, does that come in? At what point does that come in? The interest arbitration comes into play if the parties cannot reach an agreement after a specified period of time, and one of the parties requests to go. It would go from the determination of the arbitrator to the director? Exactly. And at that point, the parties could present their positions on it as well. I'd like to point out just one last point on antitrust, and then if the court would like to hear me on the Garmin preemption issue. The delegation of authority from the RCW was very broad. It was to adopt any other requirement in the interest of safety and reliability. What the Supreme Court's decisions have held is that it is the displacement of competition with regulation that needs to be foreseeable. Not the specific form of that displacement, and not the specific anti-competitive effects. And that's Phoebe Putney, that's Southern Motor Carriers. That's very clear under the Supreme Court's case law. And so it does not mean that the State of Washington had to foresee that there would be bargaining over driver's compensation. And that's not even, in fact, what Mr. Garmin was arguing up here. What needs to be foreseeable is that the municipality would displace the competitive part of this field with regulation instead. We'd love to hear a lot more, but we don't have any more time.  Thank you, Your Honor. The Chamber doesn't have any more time. We're going to give you a couple of minutes because we gave them some extra time, too. Thank you, Your Honor. As briefly as possible, the entire question here has been whether or not Seattle says price fixing somehow affects safety and reliability. Again, I'll stipulate to that. The only relevant point here is Seattle made that decision. Not the State. Didn't foresee this issue. Didn't even touch on the authorizing statute. So how can they claim a State action exemption when they are exercising their judgment? They say they don't need a detailed, specific authorization. The key word in that is detailed. They cite Southern Motors. The next sentence in Southern Motors says what you do need is that the State clearly intends to displace competition in a particular field. And all of those cases I cited, and they're all at footnote 8 of page 20 of their brief, and they can't distinguish in any of them, particular field means the kind of activity that is being challenged. That was preferred communications. That was cost. That was Golden State. That was Hudson. All the cases they rely on say the legislature needed to foresee the kind of action. Maybe they didn't need to foresee Uber and Lyft. They needed to foresee compensation arrangements with people who drive the vehicles and those who dispatch them or refer them the rides. And there's no honest reading of this statute which suggests that the State dealt with that question. On Omni. All Omni said was they said you can zone structures. And they come in and say, well, they didn't use the word billboards. And Omni said we don't care if they identified billboards because structures is obviously encompassed within it. In respect to the final argument, they say you're not supposed to look behind whether or not they had a corrupt motivation on the city council. Again, we fully agree. That's a state APA question, whether they were behaving in bad faith. The state action exemption doesn't care whether or not these people are implementing the state directive in good faith. That's for state courts to decide. What they care about is whether the state has clearly articulated a particular anti-competitive policy. So they've actually reversed it. Omni says if it's clearly articulated, we don't care if you comply. This isn't a building to a structure. Excuse me. So the driver's arrangement here under transportation and safety is not a billboard to a structure. That's my entire point, Your Honor. They have turned something that regulates how you get from point A to point B to protect the consumers, the passengers, into a labor regulation. An entirely different relationship. It's got nothing to do with moving people around Seattle. It's how much these drivers are compensated or how much they compensate the ride referral services. If in Southern Motors they say you can have price fixing on rates, which they did, no one ever thought that meant that they were authorized to have collective bargaining by Southern Motors drivers or that Southern Motors could engage in price fixing in their supply contracts. This is not some persnickety argument we're making. We're making the common sense argument that, look, there's entirely different public policy issues involved. Virtually every municipality says we're going to set uniform rates in public transportation. But no municipality has ever said, but we're also going to authorize collective bargaining by the public transportation drivers. So it's quite plausible that the vast majority of the people in the Washington State Legislature who said, Seattle, you go ahead and set the rates that people can be charged when they move from point A to point B, never would have voted for something that says, and by the way, we want you to tell the drivers that they can collectively bargain and call them independent contractors. Any other questions? Thank you. Thanks, counsel, to all of you. I apologize that we don't have more time because we know you have a lot to say, but we do thank you for the good quality of your briefs. They're very helpful. So the case just argued is submitted.
judges: M. Smith, Murguia, Robreno